## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MLADEN LAJSIC,                          )
                                        )
    Plaintiff,                          )
                                        )
    vs.                                 )    **Case number 4:12cv1799 AGF**
                                        )                      **TCM**
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
    Defendant.                          )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

    This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Mladen Lajsic for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

    Mladen Lajsic (Plaintiff) applied for DIB in January 2008,[1] alleging he had become disabled on August 16, 2004, by schizophrenia. (R.[2] at 337-43, 386.) His application was denied initially and following a hearing held in June 2009 before Administrative Law Judge

---

    [1]A prior application for DIB had been denied on May 11, 2006, following a hearing and not pursued further. (See R. at 141-51.)

    [2]References to "R." are to the administrative record filed by the Commissioner with her answer.

(ALJ) Joseph Warzycki. (<u>Id.</u> at 29-72, 133-36, 152-64, 179-83.) Following a remand by the Appeals Council, a second hearing was held in September 2010 and a third in March 2011 before ALJ Randolph E. Schum. (<u>Id.</u> at 73-131, 165-68.) His application was again denied. (<u>Id.</u> at 6-23.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's most recent decision as the final decision of the Commissioner. (<u>Id.</u> at 1-4.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Brenda G. Young, M.A., testified at the first administrative hearing.

Plaintiff testified he was then twenty-nine years old and lived in a two-story condominium with his parents and sister. (<u>Id.</u> at 34-35.) He was 6 feet 3 inches tall, weighed approximately 200 pounds, was not married, and was left-handed. (<u>Id.</u> at 35.) He had no income, but did receive Medicaid. (<u>Id.</u> at 36.) He finished high school in Bosnia. (<u>Id.</u>) He had attended college, but dropped out when his condition worsened. (<u>Id.</u> at 36-37, 60.) He received some training in filling out employment applications and in applying for a mail sorting facility, but was never hired. (<u>Id.</u> at 37, 58.) He could read and write. (<u>Id.</u> at 37.)

Plaintiff currently did not drive because of medication side-effects. (<u>Id.</u> at 35.)

Plaintiff last worked in 2006 as a cashier for a hardware store. (<u>Id.</u> at 37.) The job lasted approximately six weeks. (<u>Id.</u> at 38.) He had to quit because his condition worsened. (<u>Id.</u>) He was having auditory and visual hallucinations. (<u>Id.</u>) With the help of his vocational rehabilitation specialist, he had applied for approximately three dozen jobs in factory, janitorial, or construction work. (<u>Id.</u>) Before his job at the hardware store, Plaintiff worked

- 2 -

for various temporary employment agencies.  (Id. at 39.)  Before he was diagnosed, he worked for four months at a restaurant.  (Id.)  He had also worked taping boxes and for three hotels.  (Id. at 40, 41.)  The longest he had held any job is four months.  (Id. at 42.)

Plaintiff further testified that he spent most of the day sleeping because of his medication.  (Id.)  He sometimes helped around the house by vacuuming and washing dishes.  (Id. at 43.)  He did not do laundry because he did not know how to operate the machine; he did not change the bed sheets because he did not where the sheets were kept.  (Id.)  He did not cook.  (Id.)  He could mop and sweep, but did not do either at his house.  (Id. at 44.)  He carried groceries for his mother and sister.  (Id.)

Plaintiff did not have any friends.  (Id. at 45.)  He did not talk to any neighbors, and was not active in any clubs or organizations or churches.  (Id.)  He did not visit with any relatives.  (Id. at 46.)  He did not leave the condominium because he was afraid of communicating with people.  (Id.)  He used to enjoy drawing, but could no longer do it because his medication, haloperidol,[3] caused tremors in his left hand.  (Id.)

He did not drink alcohol or take illegal drugs.  (Id. at 47.)  He smoked five to six cigarettes a day.  (Id.)

Plaintiff's schizophrenia caused auditory and visual hallucinations from when he woke up until when he went to sleep.  (Id. at 48.)  Haloperidol – twenty milligrams a day – stopped the voices "[a] little bit."  (Id.)  Because of the haloperidol, he was always tired.  (Id.)

_____

[3]Haloperidol is an antipsychotic medication used to treat schizophrenia.  Haloperidol, http://www.drugs.com/mtm/haloperidol.html (last visited Nov. 4, 2013).

Plaintiff testified he could not stand on his feet for long, but explained when questioned that he forced himself to walk three miles when he went to the park with his sister. (Id. at 49.) In addition to haloperidol, Plaintiff took 150 milligrams of Lamictal,[4] benztropine,[5] Seroquel,[6] simvastatin (to reduce cholesterol levels[7]), and Tricor.[8] (Id. at 49-50.)

Plaintiff first started having auditory and visual hallucinations in August 2004. (Id. at 51.) He had never been hospitalized for psychiatric reasons, but did see a psychiatrist once a month. (Id. at 52.) Plaintiff further testified, however, that he had been in the hospital once for one day after attempting suicide. (Id. at 52-53.) He had anxiety attacks at night. (Id. at 53.) He was afraid to look people, including his mother and sister, in the eyes. (Id. at 54.) His voices told him that he was stupid, they wanted to kill him, and they wanted him to kill people. (Id.) He heard these voices "[e]very few seconds." (Id. at 55.)

Asked by the ALJ about a discrepancy between a reference in his medical records to reading fantasy novels and his earlier testimony that he only read the Bible, Plaintiff testified that the Bible was the only book he "mostly" read and could not remember telling his doctor that he read fantasy novels. (Id. at 61.) He used a computer to look for jobs. (Id. at 62.)

---

[4]Lamictal is an anti-epileptic or anticonvulsant medication. Lamictal, http://www.drugs.com/lamictal.html (last visited Nov. 4, 2013).

[5]Benztropine is used to treat symptoms "such as muscle spasms, stiffness, tremors, sweating, drooling, and poor muscle control" caused by Parkinson's disease or by other drugs, such as chlorpromazine, fluphenazine, perphenazine, and others. Benztropine, http://www.drugs.com/mtm/benztropine.html (last visited Nov. 12, 2013).

[6]Seroquel is an antidepressant. See Physicians' Desk Reference, 735 (65th ed. 2011) (PDR).

[7]See Id. at 537.

[8]Also prescribed to reduce cholesterol levels. See Id. at 559.

Ms. Young testified without objection as a vocational expert. (Id. at 63.) She was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age with a high school education, no past relevant work experience, and no exertional limitations. (Id. at 64.) This claimant was limited to (a) simple, repetitive tasks and instructions and (b) only occasional interaction with supervisors, co-workers, and the public. (Id. at 64-65.) Ms. Young responded that such a person could perform work in the medium work category, e.g., hand packer or packager and laundry or dry cleaning worker. (Id. at 65.)

If this hypothetical claimant had auditory and visual hallucinations and medication side effects of drowsiness and blurred vision, Ms Young stated that such problems could "interfere, depending upon their effect on his ability to perform job duties." (Id. at 66.) Her opinion would not be different if the claimant was restricted to no social interaction with other individuals. (Id. at 66-67.) Nor would Ms. Young's opinion change if the claimant had schizophrenia, nonspecific psychosis, panic attacks, drowsiness, blurred vision, homicidal and suicidal thoughts, anxiety around other people, problems interacting with other individuals, auditory hallucinations, and visual hallucinations of such apparitions as demons. (Id. at 67-68.) The jobs she had listed had very limited interaction with co-workers or supervisors and no contact with the public. (Id. at 69.) Work would be eliminated if the claimant had occasional crying spells that would require him to stop work for thirty minutes or less. (Id. at 71.)

Plaintiff, again represented by counsel, and John McGowan, Ed. D., testified at the second hearing.[9]

Asked how far he went in school, Plaintiff testified that he had had to drop out of college after two years after having a nervous breakdown caused by auditory and visual hallucinations. (Id. at 75-76.) He could not remember when he had dropped out. (Id. at 76.)

After he explained that he had never held a job for long because he would get panic attacks and hallucinate after an hour and have to go home, the ALJ inquired why he had never told his psychiatrist of such problems. (Id. at 77.) Plaintiff replied: "I did tell my psychiatrist. I'm on 20 milligrams of Haloperidol for God's sake." (Id.) Asked if it was true that he had told an evaluating consultant, Dr. Ahmad, that he had not been honest with his treating psychiatrist, Plaintiff further explained that he was afraid he was going to be placed on more medication and his current medication already adversely affected his cognitive skills. (Id. at 78.) Plaintiff testified that it was true he had not been honest with his treating psychiatrist. (Id.)

Plaintiff was currently being seen by John Rudersdorf, a psychiatrist with BJC Behavior Health. (Id. at 79.) He was taking Haldol (a brand name for haloperidol[10]) and

---

[9]During the hearing, Plaintiff's attorney stated he had wanted Plaintiff's father to testify but his request for an interpreter had been denied. (Id. at 92.) The ALJ responded that the denial was due to the timing of the request, noting that Plaintiff and counsel had been given two months' notice of the hearing and, had the request been made one month ahead, there would have been sufficient time for an interpreter to be provided. (Id.)

[10]See Haldol, http://www.drugs.com/mtm/haldol.html (last visited Nov. 12, 2013).

benztropine, the latter to relieve the tremors caused by the former.[11]  (<u>Id.</u> at 80.)  He had

constant hallucinations from when he woke up to when he went to sleep.  (<u>Id.</u> at 81.)  He had

daily thoughts of suicide.  (<u>Id.</u> at 84.)

In the past year, he had worked for seven days as a dishwasher at a restaurant and for

three or four days at a hardware store.  (<u>Id.</u> at 83-84.)  He had had to quit the first job because

of panic attacks and hallucinations and had been fired from the second job because he had

always had to be told what to do.  (<u>Id.</u>)

He did not have any friends or a girlfriend.  (<u>Id.</u> at 85.)  He did not participate in any

social activities.  (<u>Id.</u>)  He had a driver's license, but seldom drove.  (<u>Id.</u>)

Plaintiff testified that he went to sleep around nine or ten o'clock at night and woke

up around eight or nine o'clock in the morning.  (<u>Id.</u> at 86-87.)  His medications made him

"extremely sleepy."  (<u>Id.</u> at 87.)  During the day, he sometimes read and sometimes watched

television.  (<u>Id.</u>)  If he went shopping, he always went with somebody.  (<u>Id.</u>)  He walked with

his parents.  (<u>Id.</u> at 87-88.)

Asked about a reference in his medical records to a history of marijuana use, Plaintiff

testified that he had smoked it once in 2004 with some men that worked at a factory.  (<u>Id.</u> at

90.)  Asked about the reference to "marijuana abuse," Plaintiff testified that he had smoked

it "[m]ore than once, . . . definitely."  (<u>Id.</u>)  He did not smoke it anymore, nor did he use any

other illegal drug.  (<u>Id.</u> at 91.)

---

[11]<u>See</u> note 5, supra.

Mr. McGowan, testifying as a vocational expert, was asked to assume a hypothetical claimant of Plaintiff's age and education with no past relevant work or physical limitations. (Id. at 94.) This claimant was able to understand, remember, and carry out simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple, work-related decisions; adapt to routine, simple work changes; and take appropriate precautions to avoid hazards. (Id.) He should not work in settings including constant or regular contact with the general public and should not perform work including more than infrequent handling of customer complaints. (Id. at 94-95.) Mr. McGowan explained that this person could work as a dishwasher, baker, or janitor, as Plaintiff had done. (Id. at 96.)

He was then asked by Plaintiff's counsel to assume a hypothetical claimant who had problems with drowsiness and sleepiness; moderate problems understanding, remembering, and carrying out simple instructions; marked problems making judgments on simple work-related decisions; marked problems in understanding, remembering, and carrying out complex instructions; marked problems in making judgments on complex work-related problems; marked problems in interacting with supervisors and co-workers; moderate problems in interacting with the public; and extreme problems responding appropriately to usual work-related situations and changes in routine work settings. (Id. at 98.) This claimant also had visual and auditory hallucinations, panic attacks if he fell behind in his work, a diagnosis of

paranoid schizophrenia; suicidal thoughts; and a Global Assessment of Functioning (GAF) of 35.[12]  (Id. at 99.)  He testified there were no jobs this claimant can do.  (Id. at 100.)

The ALJ allowed Plaintiff thirty days to submit recent medical records.  (Id. at 91.)

Plaintiff, still represented by counsel; James D. Reid, Ph.D., a clinical psychologist; and Jeffrey McGrowski, Ph.D., C.V.E., C.R.C.,[13] testified at the third hearing.

At the beginning of the hearing, Plaintiff's counsel explained that Plaintiff's father, for whom an interpreter was available,[14] was not present because he was an over-the-road truck driver.  (Id. at 103.)

Plaintiff testified that since the previous hearing, he had told his doctor the truth about his condition; consequently, his dosage of haloperidol had been increased from twenty-five milligrams to thirty.  (Id. at 106.)  He continues, however, to hear voices and have panic attacks.  (Id.)

Asked about vocational rehabilitation, Plaintiff explained that the agency has given up on him because they could not find him a job.  (Id. at 107.)  Asked if his report to his

---

[12]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

[13]C.V.E. is an abbreviation for Certified Vocational Evaluator; C.R.C. is for Certified Rehabilitation Counselor.

[14]See note 9, supra.

doctor that he had given up on vocational rehabilitation was accurate, Plaintiff responded that he did not know what he had said.  (Id.)

 In the summer of 2010, he completed a one month truck driver's training course.  (Id. at 109.)  He had then driven with his father for 200 miles and could not go farther because of voices telling him to crash the truck.  (Id. at 110.)  He had tried working for a plastics company but could not meet the quota, had heard voices, and had panic attacks.  (Id. at 111-13.)

He had not drunk any alcohol in 2009 and did not abuse opiates.  (Id. at 110-11.)  He had tried to smoke marijuana a few times, but he stopped because it intensified his hallucinations.  (Id.)

He has visual and auditory hallucinations every day.  (Id. at 113-15.)

Dr. Reid testified as a psychological expert.  (Id. at 115-27.)  He noted that the treatment records from Barnes routinely place Plaintiff's GAF scores in the 71 to 80 range,[15] indicative of mild symptoms.  (Id. at 116.)  In those records, Plaintiff's affect is usually blunted, but otherwise his psychological examination is normal, i.e., his memory is intact; his attention, speech, behavior, and thought process are normal; his thought content is lacking delusions, hallucinations, or suicidal or homicidal ideation; his insight is fair.  (Id.)  A blunted affect means that Plaintiff is reserved and not very expressive when someone interacts with him.  (Id. at 124-25.)  There are no descriptions of panic attacks.  (Id. at 116-17.)  Based on

_____

[15]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV-TR at 34.

Plaintiff's treatment records, Dr. Reid assessed him as being mildly impaired in activities of daily living, moderately impaired in social functioning, and moderately impaired in concentration, persistence, and pace. (<u>Id.</u> at 117.) He saw no evidence of decompensation. (<u>Id.</u>) In his opinion, Plaintiff would be able to understand, remember, and carry out at least simple instructions and non-detailed tasks and would do better with limited interactions with the public, co-workers, and supervisors. (<u>Id.</u> at 118.) He considered no other restrictions to be appropriate. (<u>Id.</u>)

Noting that Plaintiff was reportedly not forthcoming when telling his treating psychiatrist how bad he was feeling, Dr. Reid gave Dr. Ahmad's evaluation no weight because it was inconsistent with Plaintiff's treatment records the month before he saw Dr. Ahmad and the month after. (<u>Id.</u> at 119-20.) If, as found by Dr. Ahmad, Plaintiff had a GAF of 35, he would meet Listing 12.03 (schizophrenia and other psychotic disorders) and would have been hospitalized. (<u>Id.</u> at 120.) Also, his treating psychiatrist would have noticed it the next month. (<u>Id.</u> at 120-21.) And, the treating psychiatrist's June 2009 letter was inconsistent with the psychiatrist's own records and assessment of Plaintiff's GAF scores. (<u>Id.</u> at 121.) Asked about Plaintiff's visual and auditory hallucinations, Dr. Reid testified that he could not recall seeing any reference in the records to visual hallucinations and the auditory hallucinations were described as "well-controlled." (<u>Id.</u> at 122.) Dr. Reid further testified that a GAF of 71 is inconsistent with an inability to retain employment. (<u>Id.</u> at 123.) GAF scores of 71 to 80 are consistent, however, with reports that everything is fine. (<u>Id.</u> at 125.)

Dr. Reid had "no idea" what the reference of Dr. Hayden to Plaintiff not being able to find employment due to "forces apparently beyond his control" meant. (Id. at 126-27.)

Dr. McGrowski, testifying as a vocational expert, was asked to assume a hypothetical claimant of Plaintiff's age and education with no past relevant work or physical limitations who is able to understand, remember, and carry out simple instructions and non-detailed tasks and who can appropriately respond to supervisors and co-workers in a task-oriented setting with infrequent and casual contact with others. (Id. at 127-28.) This claimant should not work in a setting which includes constant or regular contact with the general public. (Id. at 128.) Dr. McGrowski responded that such a claimant can work as a hand packer, laundry worker, or bindery machine feeder and offbearer. (Id. at 128-29.) These jobs are all unskilled and exist in significant numbers in the national and local economy. (Id.)

If this hypothetical claimant has restrictions of no contact with co-workers and will, because of panic attacks, have to leave or stop work once a week at least for an hour, Dr. McGrowski opined that this claimant can probably still perform the cited jobs but will have difficulty completing a trial work period. (Id. at 129.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, vocational rehabilitation and school records, records from health care providers, and various assessments of his mental capabilities.

When applying for DIB, Plaintiff completed a Disability Report.  (Id. at 385-92.)  He is 6 feet 3 inches tall and weighs 205 pounds.  (Id. at 385.)  His schizophrenia limits his ability to work by causing him to shake, hallucinate, hear voices, and lose his eyesight and concentration after approximately an hour of work.  (Id. at 386.)  These impairments first interfered with his ability to work in August 2004 and prevented him from working on the sixteenth of that month.  (Id.)  He stopped work, however, on December 31, 2006, because of his condition.  (Id.)  His medications, Haldol and Risperdal,[16] cause side effects of anxiety and loss of eyesight.  (Id. at 390.)  The highest grade of school he completed was the twelfth grade.  (Id. at 391.)  He had not attended any special trade, vocational, or job training school.  (Id.)

Also, when Plaintiff was applying for DIB, the interviewer observed no physical or mental difficulties.  (Id. at 383.)

On another Disability Report completed by his attorney, Plaintiff's disabling impairments are listed as schizophrenia, bipolar disorder, depression, and anxiety.  (Id. at 430-37.)  He stopped working on October 1, 2006.  (Id. at 431.)  He had completed one year of college.  (Id. at 436.)

On a Function Report, Plaintiff described what he does during the day.[17]  (Id. at 409.)  He gets up, washes his face and brushes his teeth, drinks coffee with his mother before she

---

[16]Risperdal (generic name is Risperidone) is prescribed for the treatment of schizophrenia.  PDR at 2741.

[17]This report is written in the first person.  It is similar in responses and handwriting to the one completed by Plaintiff's sister.  (See id. at 396-04.)  Indeed, his sister is listed as the person completing the report.  (Id. at 416.)

goes to work, prepares a simple breakfast, reads the Bible, has dinner with his mother when she returns from work, talks to her about his day, reads the Bible again, plays the guitar, and goes to sleep. (Id.) He does not take care of anyone else or of any pets. (Id. at 410.) Before his illness, he was able to concentrate at work, drive, and better communicate with people. (Id.) He has difficulty falling asleep. (Id.) He prepares simple meals, e.g., sandwiches or eggs, when his parents are at work. (Id. at 411.) He takes out the trash, vacuums, and washes the dishes. (Id.) He does not go out alone because his medication makes his vision blurry. (Id. at 412.) His hobbies include playing guitar, drawing, and reading. (Id. at 413.) He does them every day and does them well. (Id.) He does not spend time with others. (Id.) He is afraid of communicating with people and engaging in any social activities. (Id. at 414.) His impairments adversely affect his abilities to see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (Id.) He can walk three miles before having to stop and rest for five minutes. (Id.) He can pay attention for less than thirty seconds. (Id.) Because of his illness, he cannot follow written or spoken instructions. (Id.) Additionally, his father has asked him to leave, but he has no money for an apartment or to fix his car. (Id. at 416.) He needs to fix and then sell the car because he can no longer drive due to medication side effects. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his application. (Id. at 457-63.) He did not have any new illnesses or conditions since he had completed the original disability report, nor had his illnesses or their symptoms become worse or better. (Id. at 458.)

An earnings record for Plaintiff lists annual reportable earnings of $2,198[18] in 2002; $6,002 in 2003; $6,405 in 2004; $3,160 in 2005; and $3,282 in 2006. (Id. at 345.) He had one employer in 2002; six in 2003; one in 2004; four in 2005; and one in 2006. (Id. at 347.) The date he was last insured is March 31, 2009. (Id. at 352.)

A community college transcript for Plaintiff lists one "A," one "B," one "C," and a grade point average (GPA) of 3.00 for the Fall 2004 semester; two"Bs," one "C," one "W," and a GPA of 2.63 for the Spring 2006 semester; one "A," one "B," and a GPA of 3.50 for Summer 2007; and one "A," three "Bs," and a GPA of 3.23 for Fall 2007. (Id. at 585.) In Spring 2008, Plaintiff took five courses but withdrew from all but beginning guitar, in which he got an "A." (Id.) His average GPA for all semesters was 3.12. (Id.)

Vocational rehabilitation records for Plaintiff identify him as being eligible in June 2008 for the services of the Division of Vocational Rehabilitation with the Missouri Department of Elementary and Secondary Education. (Id. at 537.) His impairments are schizophrenia and "other psychotic disorders." (Id.) Claire Beck, a senior counselor with the Division, describes Plaintiff's functional limitations as including limited insight and judgment; limited stress tolerance and maladaptive response to stress; limited interpersonal and social skills; limited work tolerance; inability to perform work requiring prolonged public contact or responsibility for the safety of others; and cycles of psychiatric and emotional instability and diminished functioning alternating with periods of fair functioning. (Id.) His medications cause variable side effects. (Id.) His impediments to employment include a

---

[18]All amounts are rounded to the nearest dollar.

deterioration in his skills due to extended periods of unemployment and the need to avoid employment which is likely to aggravate his disability and pose a danger to his and others' health and safety. (Id.) Also, employers are reluctant to hire him. (Id.)

On a BJC Behavioral Health list of assessment sites, Plaintiff's first choice was working at the BJC mail room. (Id. at 581, 587.) He had spent four hours at the site in July 2008 and had done well, including being "able to work at the same rate of speed as the assessor without sacrificing the quality of his work." (Id.) His second choice was working at the Record Exchange. (Id.)

The relevant medical records are summarized below in chronological order and begin with the August 2004 record of Dragan Svrakic, M.D., when he first saw Plaintiff. (Id. at 495-96.) He noted that Plaintiff had immigrated from Bosnia two years earlier. (Id. at 495.) For the past two months, Plaintiff had had daily auditory hallucinations. (Id.) He had a history of suicidal ideation. (Id.) His sleep and appetite were good; his mood was "'down'"; his affect was blunted. (Id.) He had a history of marijuana and alcohol abuse, but had stopped two months earlier. (Id.) On examination, his speech was regular in rate and rhythm, his flow of thought was logical and sequential, his insight and judgment were good, his affect was blunted, his fund of knowledge was fair, his mood was "down," and his recent and remote memory were normal. (Id. at 496.) He was alert and oriented to time, place, and person. (Id.) He had auditory hallucinations and delusions. (Id.) He was diagnosed with schizophrenia, prescribed Risperdal, and scheduled to return in two weeks. (Id.)

According to the record, Dr. Svrakic next saw Plaintiff on January 3, 2006.  Plaintiff reported a decrease in auditory hallucinations.  (Id. at 497-98, 543-44.).  He did not have any suicidal or homicidal ideation.  (Id. at 497.)  His mood was fair.  (Id.)  He was alert and oriented to time, place, and person.  (Id.)  He had no new issues, and his condition was described as "stabilized."  (Id. at 497, 498.)  His prescription for fifteen milligram doses of Haldol was renewed.  (Id. at 497.)  His diagnosis was schizophrenia, paranoid type.  (Id. at 498.)

When Dr. Svrakic saw Plaintiff on April 3, Plaintiff was reportedly doing well and going to school.  (Id. at 499-500, 545-46.)  He had no new symptoms or issues, but complained of a decreased sex drive.  (Id. at 499.)  He had no auditory hallucinations or bizarre thoughts.  (Id.)  His condition was stable and his progress was fair.  (Id. at 500.)  His prescription was renewed.  (Id. at 499.)

On April 20, Dr. Svrakic described Plaintiff as having a stable affect and fair insight and judgment.  (Id. at 501-02, 547-48.)  He had "'soft'" auditory hallucinations.  (Id.)  His condition and progress were as before.  (Id. at 502.)  His prescription was renewed, and he was to follow-up in three months.  (Id. at 501, 502.)

In July, Plaintiff informed Dr. Svrakic that he was doing better and heard voices only occasionally and when falling asleep.  (Id. at 503-04, 549-50.)  His mood also was "'better.'"  (Id. at 503.)  He was working and socializing.  (Id.)  His appearance was neat, his behavior relaxed, his speech regular in rate and rhythm, his mood euthymic, his affect broad, and his insight and judgment good.  (Id.)  His attention, concentration, and recent and remote

memory were all normal.  (Id.)  There were no side effects from his medication, which was increased to twenty milligram doses of Haldol because of the occasional auditory hallucinations.  (Id.)

Plaintiff saw Dr. Svrakic again in September.  (Id. at 505-06, 551-52.)  He was not having auditory hallucinations.  (Id.)  The results of the mental status examination were as before with the exception of his affect, which was described as reactive and flat.  (Id. at 505.)  Clonazepam[19] was added to his medications.  (Id.)

In October, Plaintiff reported to Dr. Svrakic that his medications were causing side effects of blurred vision and tremors, but he was unwilling to reduce his dose because he was feeling good on the current amount.  (Id. at 507-08, 553-54.)  His affect was broad, otherwise his mental status examination was the same as before.  (Id. at 507.)  He was prescribed lorazepam[20] to replace the clonazepam.  (Id.)

When Plaintiff saw Dr. Svrakic in November, he reported having "'distant, soft'" auditory hallucinations, but no commands.  (Id. at 509-10, 555-56.)  His affect was flat; his mood was "'blunted'"; his insight and judgment were fair.  (Id.)  The only side effect from his medications was erectile dysfunction.  (Id. at 509.)  His prescriptions for lorazepam and haloperidol were renewed.  (Id.)

---

[19]Clonazepam is a benzodiazepine used to treat seizure disorders or panic disorder.  Clonazepam, http://www.drugs.com/clonazepam.html (last visited Nov. 12, 2013).

[20]Lorazepam is also a benzodiazepine, and is used to treat anxiety disorders.  Lorazepam, http://www.drugs.com/lorazepam.html (last visited Nov. 12, 2013).

Plaintiff next saw Dr. Svrakic in February 2007. (Id. at 511-12, 557-58.) His affect was broad; his mood was euthymic. There were no side effects from his medications. (Id. at 511.) Indeed, his response to medication was described as "good." (Id.) Plaintiff was prescribed Viagra and not lorazepam. (Id.)

His prescriptions for Viagra and haloperidol were renewed when Plaintiff saw Dr. Svrakic in April. (Id. at 513-14, 559-60.) Neither medication had any side effects. (Id. at 513.) Plaintiff mood and affect were as before. (Id.) He reported that he had applied for disability. (Id.) He was to follow-up in three months. (Id. at 514.)

Plaintiff did so, reporting he was not hearing voices or experiencing delusions. (Id. at 515-16, 561-62.) He was described as being in stable condition. (Id.) His condition was the same, including the lack of any medication side effects, when seen by Dr. Svrakic in October. (Id. at 517-18, 563-64.) Plaintiff was to follow-up in two months. (Id. at 518.)

Plaintiff followed up in three months, reporting to Dr. Svrakic in January 2008 that he was having occasional auditory hallucinations, but was used to them. (Id. at 519-20, 565-66.) He was attending community college and would occasionally experience anxiety before examinations. (Id. at 519.) His mood was flat and euphoric; his affect was flat. (Id.) He had no side effects and no new symptoms. (Id.) Dr. Svrakic opined that Plaintiff's residual auditory hallucinations were "probably baseline" for him. (Id. at 520.) He was to begin taking lamotrigine[21] for his anxiety. (Id.) He was going to school. (Id.)

---

[21]Lamotrigine is a generic form of Lamictal. See PDR at 1436.

Plaintiff informed Dr. Svrakic when he saw him in March that he had stopped taking Haldol because he "did not feel 'emotional' with it" and experienced side effects of feelings of isolation and a decreased sex drive.  (Id. at 534-35, 567-68.)  He was still going to community college and experiencing occasional anxiety and increased auditory hallucinations before exams.  (Id. at 534.)  He had a flat mood and affect, but otherwise was as before, including having normal attention and concentration.  (Id.)  He had no new symptoms and no delusions.  (Id.)  He was prescribed haloperidol, Viagra, and Lamictal, the dosage of which was increased.  (Id. at 534, 535.)  He was also started on a trial of Geodon, an antipsychotic medication.[22]  (Id. at 535.)  Dr. Svrakic noted Plaintiff was self-treating "APs."[23]  (Id.)

On April 10, Plaintiff informed Dr. Svrakic he was not compliant with his medication.  (Id. at 569-71.)  He had stopped taking Geodon because it had caused him to be sleepy and have poor motor coordination.  (Id. at 569.)  His mood and affect were flat, otherwise he was as before.  (Id.)  He did not have any suicidal or homicidal ideations or plan.  (Id.)

Twelve days later, Plaintiff was taken by ambulance to the emergency room at St. Alexius Hospital with complaints of alcohol abuse after drinking a fifth of whiskey in a three to four hour period.  (Id. at 697-713.)  He had not threatened to hurt himself.  (Id. at 721.)  He was described as "very" drunk.  (Id. at 708.)  He would not answer questions from staff.

---

[22]See PDR at 2793.

[23]Research has failed to reveal the meaning of "APs" in the context in which Dr. Svrakic used the initials.

(Id. at 704.)  He was given lorazepam and discharged within four hours with instructions to drink responsibly.  (Id.)

Two days later, he told Dr. Svrakic he had gotten drunk at home, been taken to an emergency room, and had spent the night in the hospital.  (Id. at 570, 571-73.)  He had stopped taking all his medications.  (Id. at 572-73.)  His exam results were as before.  (Id. at 572.)  He was restarted on Haldol, but all other medications were stopped.  (Id. at 573.)  His progress was "poor."  (Id. at 572.)

Plaintiff reported to Dr. Svrakic on May 8 he was taking the Haldol.  (Id. at 574-75.)  His delusions and auditory hallucinations had improved.  (Id. at 574.)  On examination, he was as before.  (Id.)  Depakote[24] was added to his medications.  (Id. at 575.)

Three weeks later, Plaintiff informed Dr. Svrakic that, although he was taking Haldol, he was still having some residual auditory hallucinations, but no delusions.  (Id. at 576-77.)  His examination results were as before.  (Id. at 576.)

They were again unchanged in June when Plaintiff next saw Dr. Svrakic.  (Id. at 578-79.)  Benztropine was added to the Geodon and Haldol.  (Id. at 579.)  Because Dr. Svrakic was changing his practice, Plaintiff was to follow-up at Wohl Clinic on July 1.  (Id.)

Consequently, Plaintiff saw Davinder Hayreh, M.D., at the Barnes Jewish Hospital (BJH) Psychiatry Clinic.  (Id. at 654-62.)  Plaintiff reported that he, his parents, and sister had sought refuge in the United States from the war in Bosnia.  (Id. at 658.)  When still in Bosnia, he had drunk heavily from the ages of 15 to 16.  (Id.)  He also had consistently

---

[24]Depakote is prescribed for the "[a]cute treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features."  PDR at 425.

smoked marijuana until 2004, when he was diagnosed with schizophrenia. (Id.) After his diagnosis, he was initially prescribed Risperdal and was then switched to Haldol and Geodon. (Id. at 657.) Currently, he had auditory hallucinations of hearing voices of people he knows and having internal conversations with them. (Id.) The only side effects of his medications were a decreased libido and a tremor in his left hand and, occasionally, blurry vision and a dry mouth. (Id.) Plaintiff further reported that he had initially been afraid to talk to people and had had to quit a job because of this fear. (Id. at 658.) Five or six times during the past three months, Plaintiff had had episodes resembling panic attacks in which he experienced a sudden onset of fear, narrowing of vision, and difficulties breathing, making eye contact, and dealing with people. (Id.) He did not have any suicidal or homicidal ideation. (Id.) His only suicide attempt had been when he had once drunk an entire bottle of whiskey. (Id.) On examination, Plaintiff was well-groomed and in no acute distress. (Id. at 659.) He was pleasant, cooperative, and had a logical, goal-directed, and sequential flow of thought; a normal volume of speech; a "somewhat slowed" rate of speech; a slightly restricted or blunted affect; and fair insight and judgment. (Id.) He described his mood as feeling "'like falling asleep.'" (Id.) He had a visible tremor in his left hand. (Id.) Dr. Hayreh noted:

> While [Plaintiff] does report auditory hallucinations, these are not entirely typical, and his presentation implies almost perfect insight into the nature of his symptoms. [Plaintiff] does not demonstrate social disengagement, poor abstraction, or particularly dramatic affective blunting. He also tends to report these auditory hallucinations primarily happening to him during periods of stress or anxiety. This raises some doubts at this point about diagnosis of schizophrenia. One possibility would be that [Plaintiff] is in fact more in line with some history of bipolar disorder or may in fact be characterizing these symptoms in a manner which is more akin to pseudo psychosis . . . .

(Id.) Dr. Hayreh's diagnosis was panic disorder and psychosis, not otherwise specified, rule out schizophrenia, rule out bipolar disorder. (Id. at 660.) Plaintiff's GAF was 71 to 80. (Id. at 661.) He was continued on his current regimen. (Id.) Plaintiff was to return in one month. (Id. at 662.)

In August, Plaintiff informed Dr. Hayreh that he was tired of Haldol, and attributed his tremors and anticholinergic side effects[25] to it. (Id. at 643-46.) He also attributed his bad mood and decrease in appetite, energy, and concentration to the medication. (Id.) Dr. Hayreh thought the attribution of side effects reasonable but not the production of psychiatric symptoms. (Id.) He informed Plaintiff that he would only reduce the Haldol once he knew Plaintiff would tolerate Seroquel well. (Id.)

When Plaintiff saw Dr. Hayreh two weeks later, on August 27, his dosage of Seroquel was increased, but there were no other medication changes. (Id. at 639-42.) Plaintiff was compliant with his medications, but had had recent side effects of dry mouth and nose bleeds. (Id. at 640.) He had not had any other side effects, including tremors. (Id.) His appetite and concentration were decreased; his energy was normal. (Id.) He was engaged in recreational activities. (Id.) He had "increased goal-directed activity, increased libido and decreased need for sleep." (Id.) He was well-groomed and did not have a visible tremor. (Id.) His affect

---

[25]Anticholinergic is defined as "[a]ntagonistic to the action of parasympathetic or other cholinergic nerve fibers." Stedman's Medical Dictionary, 101 (26th ed. 1995). Cholinergic is "[r]elating to nerve cells or fibers that employ acetylcholine as their neurotransmitter." Id. at 330. Anticholinergic effects include, but are not limited to, dry mouth, blurred vision, and dizziness. See Barbara Bradley Bolen, Ph.D., Anticholinergic Effects, http://ibs.about.com/od/glossary/g/Anticholeffect.htm (last visited Nov. 19, 2013).

was reactive and euthymic; his insight and judgment were fair.  (Id.)  His mood was okay.  (Id.)

On September 2, Plaintiff told Dr. Hayreh that his left hand tremor was better.  (Id. at 629-32.)  He spent his days watching television, drawing, and playing guitar.  (Id. at 631.)  He was "very frustrated."  (Id.)  His high levels of cholesterol were discussed.  (Id.)  His behavior was "calm but increasingly vigilant over [the] course of the app[ointment]."  (Id.)  His affect was blunted; his insight and judgment were limited.  (Id. at 632.)  He was diagnosed with psychosis, not otherwise specified.  (Id.)  Dr. Hayreh also gave him a tentative diagnosis of schizoaffective – bipolar disorder versus schizophrenia, chronic, undifferentiated type.  (Id.)  His GAF was 61 to 70.[26]  (Id.)  His dosage of Seroquel was to be increased; his dosage of Haldol was to be decreased.  (Id.)

Two weeks later, Plaintiff reported to Dr. Hayreh that he had had no medication side effects other than occasional tremors in his left hand.  (Id. at 619-22.)  He did not have any hallucinations.  (Id. at 621.)  He was "mildly depressed."  (Id.)  His sleep, appetite, and concentration were normal; his energy was decreased.  (Id.)  He was preoccupied with his lack of work.  (Id.)  He wanted, if possible, to switch to a single medication.  (Id.)  He was to continue to try to decrease his Haldol with a goal of being able to discontinue it.  (Id. at 622.)

_____

[26]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

Plaintiff consulted the health care practitioners at the BJH Internal Medicine Clinic on October 21 for a new patient health risk screening.  (Id. at 680-87.)  He had no functional limitations.  (Id. at 682.)  Although his schizophrenia symptoms had improved on medications, he still heard auditory hallucinations.  (Id. at 684.)  He had panic attacks and was sensitive to loud noises.  (Id.)  On examination, he was in no acute distress.  (Id. at 685.)

The next day, Dr. Hayreh described Plaintiff as "'doing very well.'"  (Id. at 615-18.) Plaintiff reported that his mood was stable and his sleep, appetite, energy, and concentration were all normal.  (Id. at 617.)  He was not engaged in recreational activities.  (Id.)  He had had two panic attacks in the past two weeks.  (Id.)  On examination, his appearance was clean and disheveled; his behavior relaxed and calm; his speech was regular in rate and rhythm; his motor activity was normal; his eye contact was good; his insight and judgment were fair; his thought process was goal-directed, logical, and sequential.  (Id. at 617-18.)  His affect was blunted.  (Id. at 618.)  He was diagnosed with dyslipidemia (an abnormal amount of lipids, e.g., cholesterol, in the blood) and schizophrenia.  (Id.)  He was started on a therapeutic trial of reduced dosages of Haldol.  (Id.)  His progress was "good."  (Id.)

Plaintiff informed Dr. Hayreh in December he had no complaints other than experiencing side effects of increased sleep, a dry mouth at night, and left hand tremors.  (Id. at 611-14.)  He was occasionally depressed as a result of "sitting at home all day."  (Id. at 613.)  He had no libido, but thought it was getting better on a new medication, Abilify.[27]  (Id.) He continued to look for work.  (Id.)  He got regular exercise at the park and read fantasy

---

[27]Abilify is an antipsychotic medication used in the treatment of schizophrenia.  PDR at 3459.

novels, watched television, and surfed the web.  (Id.)  His medications included Tricor, Omega, simvastatin, benztropine, haloperidol, Geodon, and Abilify.  (Id.)  His mood was "'[g]reat'"; his affect was blunted.  (Id. at 613-14.)  He was to try an increased dosage of Geodon and discontinue the haloperidol.  (Id. at 614.)

Plaintiff again saw Dr. Hayreh on January 5, 2009.  (Id. at 600-03.)  He had had a recurrence of his symptoms when taking only Geodon and had resumed taking Haldol ten days earlier.  (Id. at 602.)  He was sleeping more and eating less.  (Id.)  He had normal energy and normal concentration.  (Id.)  He was continuing to work with the vocational rehabilitation agency, but had had no results.  (Id.)  On examination, Plaintiff had normal attention and concentration, was relaxed and calm, and had a regular rate and rhythm of speech.  (Id.)  His appearance was clean and disheveled.  (Id.)  His mood was "'[f]ine'"; his affect was blunted.  (Id. at 603.)  He was not having any hallucinations.  (Id.)  Dr. Hayreh opined that Plaintiff's "description of his mood, sleep and appetite imply a developing depressive episode."  (Id.)  Plaintiff continued to have erectile dysfunction despite the Haldol having been stopped.  (Id.)  His diagnoses were unchanged.  (Id.)  His GAF was 51 to 60.[28]  (Id.)

Two days later, Plaintiff informed his general practitioner that his depression had improved.  (Id. at 677.)  He was exercising regularly and looking for a job.  (Id.)

In March, Plaintiff told Dr. Hayreh that he was doing fine.  (Id. at 597-99.)  Generally, he had no side effects, although he did have occasional tremors.  (Id.)  His mood was stable;

---

[28]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

his sleep and appetite were normal; his energy and concentration were decreased. (Id.) He was occasionally having "some breakthrough" auditory hallucinations. (Id.) He was not engaged in any recreational activities. (Id.) On examination, his mood was "'[a]lright'"; his affect was restricted; his insight and judgment were fair; his thought process was goal-directed, logical, and sequential; his behavior was relaxed and calm. (Id.) He had normal motor activity and good eye contact. (Id.) His current medications included Tricor; Omega; simvastatin; benztropine; haloperidol; Geodon; and lamotrigine. (Id.) Dr. Hayreh questioned why Plaintiff's previous physicians had not addressed the element of mania in his medical history. (Id. at 598-99.) Plaintiff was continued on his current medication regimen. (Id. at 599.)

Also in March, Plaintiff informed his general practitioner that his depression had improved. (Id. at 669.) He was exercising regularly and looking for a job. (Id.)

The next month, Plaintiff reported to Dr. Hayreh his mood was stable; his sleep, appetite, concentration, attention, and energy were normal. (Id. at 593-96.) He was going to try to plan and draw a comic book series. (Id. at 595.) His hallucinations had not changed, but they were okay if he was busy or distracted. (Id.) He had not had any recent panic attacks. (Id.) On examination, he was alert and oriented to time, place, and person. (Id.) His appearance was neat and clean; his speech was fluent; his thought process was goal-direct, logical, and sequential; his mood was "'[f]ine'"; his affect was blunted; his insight and judgment were fair. (Id.) His current medications were the same as before. (Id.) He complained that the Geodon was not doing any good, nor had he noticed any benefit from

Lamictal. (Id.) His schizophrenia symptoms were described as "stable." (Id. at 596) Dr. Hayreh noted Plaintiff had had no appreciable response to lamotrigine (Lamictal), but also noted it was still below therapeutic range. (Id.) The lamotrigine was to be continued for the present time; the ziprasidone (the generic form of Geodon[29]) would be stopped at Plaintiff's request. (Id.) Dr. Hayreh described Plaintiff as "show[ing] strong resilience and insight." (Id.) He opined Plaintiff "would benefit from work, but getting him disability benefits until he is able to obtain work is more than reasonable as he is not one to abuse benefits." (Id.) His diagnosis was panic disorder and psychosis, not otherwise specified, rule out schizophrenia, rule out bipolar disorder. (Id.) His GAF was 71 to 80. (Id.) Plaintiff's progress was "fair." (Id.)

Plaintiff saw Dr. Hayreh again on May 29, reporting no medication side effects and no auditory hallucinations. (Id. at 748-51.) His mood was stable; his appetite and concentration were normal; his energy and sleep were decreased. (Id. at 750.) He was staying in his house and exercising less. (Id.) Dr. Hayreh noted Plaintiff's "lack of motivation and lack of success with job hunting is strange." (Id. at 751.) His disability application was "not unreasonable all things considered but will ideally be self-limited." (Id.) Dr. Hayreh opined Plaintiff "would definitely benefit from a return to exercise and other activity in a setting other than home." (Id.) Plaintiff was to try citalopram for what Plaintiff "believe[d] was depression." (Id. at 750.) His current GAF was 71 to 80. (Id. at 751.)

_____

[29]See Ziprasidone, http://www.drugs.com/mtm/ziprasidone.html (last visited Nov. 12, 2013).

Plaintiff's GAF was unchanged when he saw Dr. Hayreh on July 7.  (<u>Id.</u> at 743-47.)
He reported he had had a job as a dishwasher for three weeks, but had to quit because of
sudden panic attacks.  (<u>Id.</u> at 745.)  He had had no auditory hallucinations for six to eight
weeks.  (<u>Id.</u>)  He was planning on a trip to Bosnia.  (<u>Id.</u>)  It was an "open-ended" trip to see
friends and "to get a girlfriend to bring back . . . ."  (<u>Id.</u>)  He wanted to stop the haloperidol
when in Bosnia as it interfered with his sex drive.  (<u>Id.</u>)  He had not started the citalopram
because the pharmacy never received the script.  (<u>Id.</u>)  Dr. Hayreh described Plaintiff's
symptoms as "worse from a depressive standpoint, but stable with regards to psychosis."  (<u>Id.</u>
at 746.)  He opined Plaintiff's panic attacks could ideally have been avoided had he been
taking the citalopram.  (<u>Id.</u>)  He was concerned about Plaintiff's well-being in Bosnia.  (<u>Id.</u>
at 746-47.)

Plaintiff informed Dr. Hayreh when he saw him in August that he had abandoned his
plan to go to Bosnia because of a lack of funds.  (<u>Id.</u> at 737-42.)  He had stopped taking the
citalopram two days earlier after experiencing no benefits and wanted to try Prozac.  (<u>Id.</u> at
741.)  His mood was stable; his sleep, appetite, and concentration were normal; his energy
was increased.  (<u>Id.</u>)  He was looking for work, but was trying to avoid jobs that would led
to panic attacks.  (<u>Id.</u>)  He was running up to five miles a day.  (<u>Id.</u>)  His GAF was as before.
(<u>Id.</u> at 742.)

In September, Plaintiff's mood was stable and "generally good."  (<u>Id.</u> at 734-41.)  His
sleep, appetite, concentration, and energy were all normal.  (<u>Id.</u> at 735.)  He was running in
the park.  (<u>Id.</u>)  He "report[ed] drug use," i.e., he took three to four of his eleven leftover

tramadol[30] tablets at a time.  (Id.)  This use concerned Dr. Hayreh as Plaintiff "ha[d] abused

it before and he brought it up as a non sequitur."  (Id. at 736.)  "[D]escribing its effects was

the only time that [Plaintiff] clearly and spontaneously smiled."  (Id.)  Plaintiff had stopped

looking for work, and "[was] very frustrated with the process."  (Id. at 735.)  He had also

stopped drawing, reporting that he only drew "when psychotic."  (Id.)  Plaintiff's GAF was

unchanged.  (Id. at 736.)

Also before the ALJ were assessments by examining and nonexamining consultants

of Plaintiff's mental abilities and limitations.

In April 2007, a Psychiatric Review Technique form was completed for Plaintiff by

a non-examining consultant, Judith McGee, Ph.D.  (Id. at 482-92.)  Plaintiff was described

as having paranoid schizophrenia.  (Id. at 482, 484.)  This disorder resulted in Plaintiff

experiencing moderate restrictions in his activities of daily living, moderate difficulties in

social functioning, and mild difficulties in maintaining concentration, persistence, or pace.

(Id. at 490.)  He had not had repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment, Dr. McGee assessed Plaintiff

as not being significantly limited in any of the three abilities in the area of understanding and

memory.  (Id. at 479-81.)  In the area of sustained concentration and persistence, Plaintiff was

moderately limited in five of the eight listed abilities:  his abilities to (1) carry out detailed

instructions; (2) maintain concentration and attention for extended periods; (3) perform

activities within a schedule, maintain regular attendance, and be punctual within customary

---

[30]Tramadol is prescribed for the relief of moderate to severe chronic pain.  PDR at 2888.

tolerances; (4) work in coordination with or proximity to others without being distracted by them; and (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 479-80.) He was not significantly limited in the remaining three abilities. (Id.) In the area of social interaction, Plaintiff was moderately limited in all five abilities. (Id. at 480.) In the area of adaptation, Plaintiff was not significantly limited in two of the four listed abilities and was moderately limited in the other two: his ability to travel in unfamiliar places or use public transportation and his ability to set realistic goals or make plans independently of others. (Id.)

In March 2008, a Psychiatric Review Technique form was again completed for Plaintiff by another non-examining consultant, Robert Cottone, Ph.D. (Id. at 521-31.) He found Plaintiff to have persistent psychotic features and deterioration evidenced by "[i]ncoherence, loosening of associations, illogical thinking, or poverty of content of speech" associated with a flat affect. (Id. at 522.) There was insufficient evidence for him to determine if Plaintiff had schizophrenia or another psychotic disorder. (Id. at 521.) There was also insufficient evidence for him to assess the degree of limitation caused on his functioning by any mental impairment. (Id. at 529.)

In August 2009, Plaintiff underwent a psychiatric evaluation by Aqeeb Ahmad, M.D. (Id. at 718-20, 722-25.) His presenting complaint was paranoid schizophrenia. (Id. at 722.) Plaintiff reported to Dr. Ahmad that "he has 'hallucinations' and also hears voices. He gets angry, gets agitated and gets hyperactive. He sees little creatures called goblins and sees

faces, eyes, various things on various surfaces . . . . Voices tell him that he is stupid that he should end his life or they call his mother names and curse her. . . ." (Id.) Plaintiff reported that he is angry and "always think[s] about killing any person who talks to him in a certain way." (Id. at 723.) He related the horrors he had seen when in Bosnia, including beheaded bodies and a friend drowning in a river. (Id.) Asked about the references in the notes of his treating psychiatrist to Plaintiff doing well, Plaintiff explained he did not want the psychiatrist to know he was feeling bad because Plaintiff liked him and did not want to upset him. (Id.) He was feeling more depressed and hearing more voices. (Id.) He had recently quit a job after two weeks because he had a panic attack, palpitations, shortness of breath, and chest tightness. (Id.) He smoked approximately one-half pack of cigarettes a day; had stopped using marijuana several years ago; and had approximately two alcoholic drinks on weekends when he went out with his sister. (Id.) His daily activities included staying at home, reading the Bible, and watching television. (Id. at 724.) He goes to church once a month; he does not date. (Id.) On examination, his speech was slow, but logical and sequential. (Id.) He was fully-oriented to time, place, and person. (Id.) He had "great difficulty doing serial 7 subtractions." (Id.) Dr. Ahmad's diagnosis was schizoaffective disorder, depressed versus bipolar disorder, psychosis, currently depressed episode; posttraumatic stress disorder; and possible panic disorder. (Id.) His GAF was 35. (Id.) Dr. Ahmad concluded:

> [Plaintiff's] current picture appears quite different than the record provided
> . . . . [His] explanation was that he does not tell his treating psychiatrist the
> true story and feels happy with him. However, during this interview, he
> appeared fairly dysfunctional. He probably will have a difficult time holding

a job more than a few days or getting along with people because of paranoia, hallucinations and panic attacks. . . . He most likely will be able to manage his funds . . . .

(Id. at 725.)

Two months before, on June 22, Dr. Hayreh wrote as follows about Plaintiff's impairments.

[Plaintiff] carries the diagnosis of Paranoid Schizophrenia and I have, and will continue to, tried to treat [him] with antipsychotic and mood-stabilizing medications.

His case is highly unusual in that his symptoms are highly atypical and controlling those symptoms has been extremely difficult. His case is also complicated by significant social anxiety, a cultural barrier ([he] is originally Bosnian) and his subsequently deficient work and educational history. [Plaintiff] has a form of hallucinatory psychosis which has never, to my knowledge, been encountered before. He has taken combinations of multiple antipsychotic medications with frequently inadequate control of these symptoms. Because of their pervasive and unusual quality, these symptoms are very disturbing and interfere with his ability to work and sleep. His need for medication has frequently left him quite sedated and further impeded by arm tremors. His condition has also created an apparently reactive depressive condition at times which further impedes his function.

[Plaintiff] has a longstanding form of social phobia in which he has great difficulty dealing with the general public. This is a common complication of patient with Schizophrenia and similar diseases. Sadly, this appears to be no better or worse when his psychosis is treated. . . .

Despite these difficulties, [Plaintiff] has attempted to find work via vocational rehab. To date, this has yielded no results. While I am not clear on what has prevented his gaining employment, he has demonstrated that any efforts to obtain disability benefits come not form a dearth of effort or interest in work but rather from forces apparently beyond his control.

(Id. at 715-16.)

## The ALJ's Decision

- 33 -

The ALJ first determined that he would "address only the issue of whether or not [Plaintiff] became disabled at any time after May 11, 2006," the date of a prior adverse decision that Plaintiff had not requested the Appeals Council to review,[31] and on or before March 31, 2009, his date last insured.  (Id. at 10, 12.)

The ALJ next determined Plaintiff had not engaged in substantial gainful activity during the relevant period and, through the date last insured, had severe impairments of a psychotic disorder and schizophrenia undifferentiated.  (Id. at 12.)  During the relevant period, however, Plaintiff did not have a impairment or combination thereof that met or medically equaled an impairment of Listing level severity, including Listing 12.03.  (Id.)  Specifically, Plaintiff had mild restrictions in his activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id. at 13.)  The ALJ noted with respect to the last two areas that Plaintiff had attended college.  (Id.)  Also, Plaintiff had not had any episodes of decompensation of extended duration.  (Id.)

Plaintiff did have the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with nonexertional limitations of (a) understanding, remembering, and carrying out at least simple instructions and non-detailed tasks and (b) responding appropriately to supervisors and co-workers in a task-oriented setting where contact with others is infrequent and casual.  (Id.)  Plaintiff "should not work in a setting which includes constant/regular contact with the general public."  (Id.)

_____

[31]See note 1, supra.

The ALJ then summarized the record, including the reports of Plaintiff's father wanting him to move out but Plaintiff had no money for an apartment and the records of Drs. Svrakic and Hayreh. (Id. at 14-18.) The ALJ noted that three days after writing in support of Plaintiff's disability application, Dr. Hayreh reported Plaintiff's mood and symptoms were stable. (Id. at 17.) He declined to give Dr. Hayreh's letter any weight "as his report is solely for the purpose of getting [Plaintiff] disability benefits until he is able to obtain work . . . ." (Id. at 18.) The ALJ also declined to give Dr. Ahmad's report, including his GAF rating of 35, any weight as it was (a) inconsistent with Dr. Hayreh's GAF ratings of 71 to 80 given one day and one month later, (b) inconsistent with Plaintiff's treatment notes, and (c) after Plaintiff's date last insured. (Id. at 18-19, 21.) When evaluating the opinions of Drs. Hayreh and Ahmad, the ALJ found the assessment of Dr. Reid relevant and instructive. (Id. at 19-20, 21.)

Next, the ALJ evaluated Plaintiff's credibility. (Id. at 20-21.) He noted Plaintiff's May 2008 GPA, his lack of psychiatric hospitalization, his poor work and earnings history, and the "significant evidence of noncompliance and inconsistent evidence pertaining to [Plaintiff's] use of alcohol and marijuana." (Id.)

Plaintiff had no past relevant work. (Id. at 21.) With his age, education, and RFC, Plaintiff did have, however, the ability to perform such representative occupations as hand packer, laundry worker, and bindery machine feeder. (Id. at 22.) He was not, therefore, disabled within the meaning of the Act during the period from August 16, 2004, to Mach 31, 2009. (Id. at 23.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 423(d)(1). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or

combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'"  **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).  The

Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions

represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789). <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) posing a question to the VE that did not include his left hand tremor and his blurred vision, and (2) relying on Dr. Reid's testimony rather than the opinions of Drs. Hayreh and Ahmad. The Commissioner disagrees.

<u>Hypothetical Questions to the VE.</u> As noted above, a hypothetical question posed to a VE "'must capture the concrete consequences of the claimant's deficiencies.'" **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011) (quoting <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001)). "However, the ALJ may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated.'" **Id.** (quoting <u>Hunt</u>, 250 F.3d at 625) (alteration in original). Plaintiff argues that the ALJ committed reversible error by not including his left hand tremor and blurred vision in the hypothetical question to Dr. McGrowski.

The period at issue is from May 11, 2006, to March 31, 2009. Plaintiff testified at the first, June 2009 hearing that he cannot draw due to the tremor in his left hand, which is his dominant hand. In the second, September 2010 hearing, he testified that he was taking benztropine to relieve the tremors caused by taking Haldol. In his Disability Report, he cited a loss of eyesight and shaking among the effects his impairments had on his ability to work.

And, in a Function Report, he noted that his medication makes his vision blurry. In that same report, however, he stated his hobbies include drawing and playing guitar, both of which he does every day and does well.

Compared to these scant reports of tremors and blurred vision made after his date last insured, Plaintiff did not complain of either to his first treating physician, Dr. Svrakic, until the fifth time he saw him, in October 2006. At that same visit, however, he declined to reduce his dose of medication to address these unwanted side effects because he was feeling good on the current dose. At the next visit, in November 2006, the only side effect he complained of was erectile dysfunction. It was not until six visits later, in March 2008, that he again complained of a side effect, but the complaint was of feelings of isolation and a decreased sex drive and not of tremors or blurred vision. At the next visit, in April 2008, the complained-of side effect was of poor motor coordination, which Plaintiff attributed to the medication, Geodon, that he had begun taking after the last visit. In July 2008, Plaintiff complained to Dr. Hayreh, his new treating physician, of side effects of a left-hand tremor and *occasional* blurred vision. The tremor was noted to be visible. The next month, Plaintiff complained of a tremor only. In the second visit to Dr. Hayreh that month, Plaintiff had no tremor and no other medication side effects. In September, he reported both that the tremor was better and that he was drawing and playing guitar. In the second visit that month, he described the tremor as occasional. In October, he did not mention any side effects; indeed, he was described as "doing very well." In December, he complained of tremors, but was looking for work. Two visits later, in March 2009, he complained of an occasional tremor.

That same month, he was reportedly looking for work. The next month – after his date last insured – he was planning and drawing a comic book series.

"'[A]n ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when [t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities' or 'when the record does not support the claimant's contention that his impairments significantly restricted his ability to perform gainful employment'" **Buckner v. Astrue**, 646 F.3d 549, 561 (8th Cir. 2011) (quoting Owen, 551 F.3d at 801–02). As is evident from the foregoing, there is no medical evidence in the record to support any limitations on Plaintiff's functioning caused by either his left-hand tremor or blurred vision. Both were only occasional side effects. In the twenty-four doctor visits during thirty-four month period at issue, Plaintiff complained of tremors eight times and blurred vision twice. When complaining of blurred vision the second time, Plaintiff described it as occasional. When complaining of tremors, Plaintiff once mentioned at the same visit that he was looking for work and at another visit that he was drawing and playing the guitar. Indeed, at the last visit during the relevant period, Plaintiff stated that he was looking for a job and did not complain of either blurred vision or left-hand tremors.

And, insofar as Plaintiff's testimony supports his argument that a left-hand tremor and blurred vision imposed restrictions on his functioning, that testimony alone is insufficient to require the ALJ to include both in his hypothetical question to the VE. "[T]he ALJ [is] not required to adopt [the claimant's] unsupported subjective complaints and self-imposed

limitations." **Perkins**, 648 F.3d at 902. Moreover, his testimony was found not credible by the ALJ. He does not challenge this finding.[32]

      <u>Drs. Reid's, Hayreh's, and Ahmad's Opinions.</u> Plaintiff next argues that the ALJ erred by (1) relying on Dr. Reid's opinion about Plaintiff's functioning capabilities because Dr. Reid testified that Plaintiff's inability to keep a job for longer than a month would be problematic to retaining competitive employment; (2) giving no weight to Dr. Hayreh's opinion Plaintiff was unable to work, his medications leave him sedated, and his tremor creates impediments to employment; and (3) Dr. Ahmad's opinion that Plaintiff would not be able to maintain employment.

      As noted by Plaintiff, "[g]enerally, '[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting <u>Perkins</u>, 648 F.3d at 897) (second alteration in original). "However, '[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole.'" **Id.** (quoting <u>Perkins</u>, 648 F.3d at 897). Rather, "'[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" **Id.** (quoting <u>Perkins</u>, 648 F.3d at 897–98).

---

[32]Were Plaintiff to challenge the ALJ's adverse credibility determination, his challenge would be without merit for the reasons set forth in the Commissioner's supporting brief. (<u>See</u> Def.'s Br. at 6-9, ECF No. l7.)

- 43 -

During Dr. Reid's testimony, the following exchange took place between him and Plaintiff's counsel.

> Q. And given that he's not been able to keep a job for more than about a month in the last four attempts, I think, *he's had in the last year and a half*, I mean, do you find that problematic with him retaining employment?
>
> A. It is a problem, that he has been unable to maintain employment. *I don't know why*.

(R. at 123 (emphasis added)). This exchange does not support Plaintiff's argument for two reasons. First, the question references only the past eighteen months and the hearing took place in March 2011, almost twenty-four months after the date Plaintiff was last insured. Second, Dr. Reid testified that he did not know why Plaintiff could not maintain employment during the cited period for longer than a month. He did not state or imply that Plaintiff's inability was due to a mental or physical impairment.

There is also no merit to Plaintiff's argument that the ALJ erred by giving no weight to Dr. Hayreh's opinion Plaintiff was unable to work, his medications leave him sedated, and his tremor creates impediments to employment.

Dr. Hayreh's opinion that Plaintiff could not work did not include the reason why Plaintiff could not do so. See **McDade v. Astrue**, 720 F.3d 994, 999-1000 (8th Cir. 2013) (affirming ALJ's discounting as conclusory claimant's treating physician's opinion about why claimant could not work when physician failed to explain her reasoning). Indeed, he opined just the opposite, writing "While I am not clear on what has prevented his gaining employment . . . ." (R. at 715.) To be disabled under the Act, a person must be "unable to engage in any substantial activity *by reason of* any medically determinable physical or mental

impairment . . . ." 42 U.S.C. § 423(d)(1). Moreover, insofar as Dr. Hayreh's opinion might be construed as being that Plaintiff could not work because of his impairments, the opinion is inconsistent with Dr. Hayreh's GAF scores, which were consistently in the 71 to 80 range, indicating transient symptoms at worst and slight impairments in occupational functioning. See **Myers v. Colvin**, 721 F.3d 521, 525 (8th Cir. 2013) (noting that the Eighth Circuit has "considered GAF scores in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record").

Dr. Hayreh's report that Plaintiff's medications leave him sedated and cause tremors is clearly based on Plaintiff's own reports of such. See **Teague v. Astrue**, 638 F.3d 611, 616 (8th Cir. 2011) (affirming ALJ's decision to discount treating physicians's opinions about claimant's functional limitations when such limitations were based on claimant's subjective complaints and not on physicians's own objective findings). Plaintiff began seeing Dr. Hayreh in July 2008. In the twelve visits with Dr. Hayreh before the letter was written, Plaintiff only sporadically complained of medication side effects of a left-hand tremor. His complaints of decreased energy and increased sleep were also sporadic, and, when made, were not always linked. For instance, in August 2008, he complained of normal sleep and decreased energy. The next month, both his sleep and energy were normal. In March 2009, he complained of both sleep and energy being decreased, but two days later told his general practitioner that he was exercising and looking for work.

Dr. Ahmad opined that Plaintiff would probably "have a difficult time holding a job more than a few days . . . ." (R. at 725.) Plaintiff argues that the ALJ erred by not giving this

opinion any weight. This opinion is clearly based only on Plaintiff's own complaints. Illustrating this reliance is Dr. Ahmad's assessment of a GAF score of 35, indicating a major impairment in work. The next day, Dr. Hayreh, Plaintiff's treating physician, assessed a GAF score of 71 to 80. Dr. Ahmad accepted Plaintiff's explanation – that he had not told Dr. Hayreh the truth – for the apparent discrepancy between his description to Dr. Ahmad of his difficulties and the reports of Dr. Hayreh. For Dr. Ahmad's opinion to have the weight Plaintiff urges, "it must not be 'inconsistent with the other substantial evidence in [the] case record.'" **Hacker v. Barnhart**, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Dr. Ahmad's opinion was not. Nor was the ALJ obligated to agree with Dr. Ahmad that Plaintiff offered an acceptable explanation for the difference between his one-time reports to Dr. Ahmad and his reports over the course of one year to his treating psychiatrist.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  21st  day of November, 2013.